Filed 2/23/16  Yahoo! Inc. v. Media Relevance, Inc. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| YAHOO! INC., | H041872 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 1-14 CV-264874) |
| v. | |
| MEDIA RELEVANCE, INC. et al., | |
| Defendants and Appellants. | |

In this appeal, Steven Clarke-Martin and the company he created, Media Relevance, Inc., seek review of an order denying their motion to strike a complaint brought against them by plaintiff Yahoo! Inc.  In the complaint Yahoo! alleged that Clarke-Martin had wrongfully assigned patent rights belonging to Yahoo! and copied Yahoo!'s confidential information without authorization, both in violation of an employment agreement between him and Yahoo!  On appeal, defendants contend that reversal is required because Yahoo!'s action is clearly a Strategic Lawsuit Against Public Participation (SLAPP) which has impugned Clarke-Martin's integrity and damaged his business.  We conclude that the criteria for striking an order under Code of Civil Procedure section 425.16 have not been met.  Consequently, we must affirm the order.

*Background*

Clarke-Martin was an employee of Yahoo! between 2003 and 2007.  When he joined the company in October 2003 he signed an "Employee Confidentiality and Assignment of Inventions Agreement" (Confidentiality and Assignment Agreement).

Among the terms of the agreement were two provisions material to this lawsuit.  In paragraph 6 Clarke-Martin promised not to disclose Yahoo!'s "Confidential Information" or to reproduce Yahoo!'s "Proprietary Information."[1]  The terms "Proprietary Information" and "Confidential Information" included patents, trade secrets, and other intellectual property.

Then, in paragraph 8, Clarke-Martin promised to "assign to Yahoo! . . . my entire right, title, and interest in and to . . . all Inventions which I may solely or jointly develop or reduce to practice during (a) the time I am employed, whether or not during normal working hours, (b) any prior period in which I performed services for or on behalf of Yahoo!, or (c) within three (3) months following the termination of my employment with Yahoo!, which (i) relate to, result from or are suggested by any current or reasonably anticipated business activity of Yahoo!, (ii) are aided by the use of time, material, Proprietary Information or facilities of Yahoo!, whether or not during working hours or (iii) relate to any work I performed for Yahoo!, whether or not during normal working hours, at any time.  I understand and agree that any inventions I create at any time which

---

[1] This provision stated, in relevant part, "I agree that both during and following the termination of my employment with Yahoo! for any reason, I shall hold in confidence all Confidential Information of Yahoo! furnished by Yahoo! to me, or reproduced or developed by me based on or incorporating Yahoo!'s Proprietary Information.  I agree that, except with Yahoo!'s prior written permission or in furtherance of my duties for Yahoo!, I shall not, directly or indirectly, use, disclose, reproduce, distribute, reverse engineer, or otherwise misappropriate any Proprietary Information, in whole or in part, and shall take no action that may cause, or fail to take any action necessary to prevent causing any Proprietary Information to lose its character as Proprietary Information.  Upon termination of my employment with Yahoo! for any reason, or upon any earlier request by Yahoo!, I shall promptly return to Yahoo! or destroy all documents or materials, of any nature, in my possession, custody or control containing Proprietary Information  (regardless of the medium in which such information is stored) that have been furnished by Yahoo! to me, or reproduced or developed by me based on or incorporating Yahoo!'s Proprietary Information."  There was no dispute in this proceeding over the comprehensive meaning of the term "Confidential Information."

incorporate the Proprietary Information or other property of Yahoo! are the property of Yahoo! and I hereby assign all such Inventions." In an exception highlighted by Clarke-Martin, this paragraph stated, "Notwithstanding the foregoing, this Agreement does not apply to any Invention that I developed entirely on my own time without using Yahoo!'s equipment, supplies, facilities, or Proprietary Information except for those Inventions that either relate at the time of conception or reduction to practice of the Invention to Yahoo!'s business, or actual or demonstrably anticipated research or development of Yahoo!; or result from any work performed by me for Yahoo!. I agree to identify all Inventions made by me to Yahoo! in confidence to permit a determination as to whether . . . the Inventions are the property of Yahoo!, and I agree to disclose all information Yahoo! reasonably requests about Inventions including those I contend qualify under this exception to my duty to assign Inventions. I shall not apply for any patent, copyright, or trademark on any Inventions conceived during any period of employment with Yahoo! without the prior written approval of Yahoo!'s legal department."

In August 2005 Clarke-Martin submitted an idea that would "leverage assisted matching" of "Y! Music listeners" to Yahoo!'s advertiser base. In October 2006, together with another Yahoo! employee, Chris Kalaboukis, Clarke-Martin submitted their project to display advertising as users play music or watch music videos on their devices. Yahoo!'s Patent Asset Development Group notified Kalaboukis and Clarke-Martin that it would be contacting them "in the near future" to discuss their "idea submission."

On April 6, 2007, Yahoo! filed U.S. Patent Application No. 11/697,615 ('615), bearing the title "Method and System for Displaying Contextual Advertisements with Media." The application identified both Kalaboukis and Clarke-Martin as inventors and listed Yahoo! as assignee. Kalaboukis signed the application and his assignment to Yahoo! was recorded on July 20, 2007. Clarke-Martin, however, refused to sign the supporting declaration confirming that he was one of the inventors. Pursuant to

3

35 U.S.C. section 116, subdivision (b), and paragraph 10 of the Confidentiality and Assignment Agreement,[2] Yahoo! submitted a petition to waive his signature. Attached to the petition was an e-mail message from Clarke-Martin to Kalaboukis stating that Clarke-Martin would not sign the application because Yahoo! had "violated my equal employment rights, invalidating my employment agreements and claims to my intellectual property." Yahoo!'s petition was granted in May 2008, and Patent No. 7739596 (the '596 patent) issued on June 15, 2010. Yahoo! later filed applications for additional patents, which it has referred to in this litigation as "the '596 patent family."

Meanwhile, on January 2, 2007, following the December holiday period, Clarke-Martin stopped reporting for work. Two days later he copied material from his laptop onto eight compact discs. A forensic search later indicated that dozens of the documents copied were labeled "Confidential" or "Proprietary and Confidential." Included among these, according to David Brightman, a vice president and counsel for Yahoo!, were "internal business strategy documents."[3] In the ensuing days,

---

[2] According to 35 U.S.C. section 116, subdivision (b), "If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself and the omitted inventor." In addition, paragraph 10 of the Confidentiality and Assignment Agreement stated, "If Yahoo! is unable for any reason to secure my signature to apply for or to pursue any application for any Inventions assigned to Yahoo! as above, then I hereby irrevocably designate and appoint Yahoo! and its duly authorized officers and agents as my agent and attorney in fact, to act for and on my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent . . . with the same legal force and effect as if executed by me."

[3] Brightman was convinced by the subsequent forensic analysis that several of those "internal business strategy documents" were relevant to Media Relevance, a business Clarke-Martin had started in 2009. That business, according to Clarke-Martin, "shares revenue with the sellers of advertising or content publishers in return for targeting ads based on contextual relevance."

4

Clarke-Martin complained to Yahoo!'s human resources (HR) personnel, accusing the company of racial discrimination and noncompliance with the Sarbanes-Oxley Act of 2002 (SOX).  He complained that the company was asking him to "lie, or misrepresent information" and suggested that "[t]he spirit of direct or indirect actions feel [*sic*] very much like retaliation."[4]

A Yahoo! HR employee, Melina Leyco, responded to Clarke-Martin's complaints, reminding him that he had previously stated that the company had "never asked [him] to lie or make any misrepresentation."  Leyco added that her investigation had uncovered no violation of the company's SOX obligations, and she requested more information about Clarke-Martin's assertion of racial discrimination.  Leyco encouraged Clarke-Martin to return to work, or if he was sick, to secure a doctor's note for his absence or apply for a medical leave of absence.  Instead, on January 5, 2007, Clarke-Martin submitted complaints with the Securities and Exchange Commission (SEC) and the Equal Employment Opportunity Commission (EEOC).[5]  His employment ended April 6, 2007.

Clarke-Martin also brought suit against Yahoo!, but after proceeding to arbitration the parties settled that dispute in May 2008.  Yahoo! agreed to pay Clarke-Martin $166,700 and provide him with three months of employment "outplacement services."  Clarke-Martin expressly represented that he had not suffered any "job-related wrongs or injuries" such as discrimination.  He released "all known and unknown claims that he presently has against the Company," with specified exceptions, such as "any potential claims related to" the '615 patent application.

---

[4] According to a November 2014 declaration submitted by Clarke-Martin in support of his motion to reconsider his anti-SLAPP motion, Yahoo! had exerted pressure on him to submit a false report in preparation for a company audit.

[5] After receiving Yahoo!'s response, the EEOC found the complaint to be without cause.  Any action taken by the SEC is not in the record before us.

In 2009 Clarke-Martin started a business called 41 Ads, Inc., which was later renamed Media Relevance. The company consisted in an implementation of Clarke-Martin's targeted ad-matching invention, which had become the basis of the '615 patent application and eventual '596 patent. On October 4, 2011, Clarke-Martin executed an "Assignment of Patent Rights" to 41 Ads. In this document Clarke-Martin asserted that he possessed "the right, title and interest for and in" the invention described in the '596 patent, and he requested the Commissioner for Patents to issue the patent to the assignee. Clarke-Martin recorded this assignment on October 11, 2011.

It was not until January 2013 that the assignment came to Yahoo!'s attention. On that occasion Jesse Martinez, a representative of 41 Ads, contacted Yahoo!'s "business development" director, Bob Upham, saying that 41 Ads "[would] like to discuss the IP we co-share with Yahoo[!] as it relates to our startup and if there is an opportunity to partner with Yahoo[!]." Upham expressed confusion over whether 41 Ads was seeking a business partnership or a licensing of Yahoo!'s intellectual property. Martinez replied, "Most likely both since we would like to partner with Yahoo[!] but we are also leveraging IP that we co-own." According to its patent counsel, David Ishimaru, Yahoo! then reviewed the assignment records associated with the '596 patent and discovered Clarke-Martin's October 4, 2011 assignment. On February 21, 2013 Yahoo! recorded the July 2007 assignment of Clarke-Martin's interest in the '615 application (the eventual '596 patent).

Yahoo! initiated this action on May 6, 2014, naming Clarke-Martin and Media Relevance, the successor to 41 Ads. The first four causes of action—quiet title, breach of contract, conversion, and a request for declaratory relief—were directed at Clarke-Martin's assignment to his own company by falsely claiming title to the '596 patent. The fifth through eighth causes of action—breach of contract, conversion, breach

6

of the duty of loyalty, and violation of Penal Code section 502[6]—were aimed at Clarke-Martin's "[u]nauthorized [c]opying" of the contents of his Yahoo! personal computer onto compact discs and his failure to return the discs thereafter. Yahoo! sought damages, a declaration that it was the rightful owner of the entire '596 patent family, an order requiring Clarke-Martin to reverse the assignment to his company, an order requiring him to return the improperly copied Yahoo! information he possessed, and an injunction against his asserting any claims of ownership interest in the '596 patent family.

Clarke-Martin attempted to answer the complaint on behalf of Media Relevance as well as himself. After securing counsel, defendants obtained leave to file the motion at issue here, the anti-SLAPP motion under Code of Civil Procedure section 425.16 (hereafter section 425.16). Defendants contended that this action was a SLAPP because

---

[6] Penal Code section 502, subdivision (c), describes multiple offenses related to the use of computers and computer data. An offender under this expansive provision includes one who "(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data. [¶] (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network. [¶] (3) Knowingly and without permission uses or causes to be used computer services. [¶] (4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network. [¶] (5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network. [¶] (6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section. [¶] [or] (7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network." The affected owner of the "computer, computer system, computer network, computer program, or data" may sue the offender for any loss it incurs as a result of these violations, as well as attorney fees for the action. (Pen. Code, § 502, subds. (e)(1), (e)(2).)

it arose from a protected act—namely, the recording of an assignment of a patent, which "constitutes a formal communication to the USPTO [United States Patent and Trademark Office] seeking official action in an official proceeding governed by statute, and Clarke-Martin's recording his patent assignment was the final official act in [a] series of acts that started with his filing of inventor's declaration . . . [which] creates a presumption of ownership."[7]

In support of their position defendants cited *Mindys Cosmetics*, *Inc*. *v*. *Dakar* (9th Cir. 2010) 611 F.3d 590, 596-597, where the Ninth Circuit determined that the act of filing a trademark application with the USPTO was a protected act under section 425.16, subdivision (e)(1). According to defendants, the first three causes of action "hinge on Clarke-Martin's public statement that he was a co-owner of the Patent and had the power to assign it," and all arose from his recording of the assignment. The claims regarding the copying of information (the copying causes of action) likewise were related to the recording of the assignment, and they did not in any case allege that the copying was "illegitimate" rather than in furtherance of Clarke-Martin's duties.

Defendants further attacked the complaint as legally insufficient on both procedural and substantive grounds. Defendants specifically contended that Yahoo! was unlikely to prevail because all of its claims were barred by both the applicable statutes of limitations and laches, and because the allegations were technically deficient.

In its opposition Yahoo! asserted that its claims did not arise from any protected activity. The first four causes of action, it argued, were based not on Clarke-Martin's *recording* of an assignment but from the original act of making the assignment. As for

---

[7] In June 2008 Clarke-Martin submitted a declaration to the United States Patent and Trademark Office (USPTO), stating that he was the inventor of the subject matter of the '615 application. In May 2010 Clarke-Martin wrote to the patent office, identifying himself as "inventor and holder" of the pending '596 patent and requesting that it change his address on file.

8

the four "copying causes of action," Yahoo! argued likewise that they did not arise from any protected recording activity—indeed, Yahoo! emphasized, they had "nothing to do with the assignment of the '596 patent—much less the recording of that assignment." Instead, according to Yahoo!, those claims were directed at the unauthorized copying of Yahoo!'s confidential information, including business strategy documents that *predated* the filing of the patent application.

The superior court denied defendants' motion, finding that Yahoo!'s lawsuit was not based on protected activity. Citing Code of Civil Procedure section 1008, defendants then moved for reconsideration in order to bring to light what they called a mischaracterization of facts by Yahoo! regarding Clarke-Martin's alleged theft of Yahoo!'s strategic plans in January 2007. Defendants now claimed that Clarke-Martin had "created a back-up of his hard-drive to provide whistleblower evidence to relevant authorities because he felt he was being pressured by Yahoo to commit a crime."

Accompanying defendants' reconsideration motion was Clarke-Martin's declaration attesting to his conflict with Yahoo! over compliance with SOX and the pressure he had experienced over Yahoo!'s requirement that he submit a false verification report in preparation for the year-end audit. According to this declaration, Clarke-Martin had created the hard-drive backup in order to substantiate his complaints to the EEOC and the SEC. Clarke-Martin defended his failure to provide this evidence earlier by noting that the settlement agreement required him to avoid disparaging Yahoo!. But now that Yahoo! had falsely accused him of stealing strategic plans for use in a rival company, he had "no choice but to set the record straight."

Yahoo! opposed the reconsideration motion, disputing Clarke-Martin's claim that he could not have brought his whistleblowing justification to the court's attention earlier. It also emphasized that the "copying causes of action" were not based on Clarke-Martin's complaints to the government but on the copying itself, which was not protected activity. Furthermore, it was apparent that Clarke-Martin had provided only hard copies of

documents to the government, but had never returned the discs to Yahoo! as required by both the Confidentiality and Assignment Agreement and the settlement agreement.

The superior court rejected defendants' proffered justification for not presenting earlier their explanation for Clarke-Martin's copying of the information. It further ruled that "[e]ven if the purportedly new facts warranted reconsideration, the prior ruling remains correct . . . Yahoo[!]'s fifth through eighth causes of action do not arise from Defendant's [*sic*] alleged filing of whistleblower complaints; rather, [those] causes of action arise from Defendants' [*sic*] unlawful copying of Yahoo[!] content." This timely appeal followed.

*Discussion*

1. *Standard and Scope of Review*

The parties understand the nature of section 425.16 and the legislative intent underlying its enactment. "A SLAPP is a civil lawsuit that is aimed at preventing citizens from exercising their political rights or punishing those who have done so. ' "While SLAPP suits masquerade as ordinary lawsuits such as defamation and interference with prospective economic advantage, they are generally meritless suits brought primarily to chill the exercise of free speech or petition rights by the threat of severe economic sanctions against the defendant, and not to vindicate a legally cognizable right." ' " (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 (*Simpson Strong-Tie*); *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1126.)

Section 425.16 was enacted in 1992 to address the "disturbing increase" in the frequency of these meritless harassing lawsuits. (§ 425.16, subd. (a); see *Navellier v. Sletten* (2002) 29 Cal.4th 82, 85, fn. 1 (*Navellier*); *Simpson Strong-Tie*, *supra*, 49 Cal.4th at p. 21.) It was the Legislature's finding "that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly." (§ 425.16, subd. (a).) The statute was thus designed to deter

10

meritless actions that "deplete 'the defendant's energy' and drain 'his or her resources,' [citation] . . . ' "by ending them early and without great cost to the SLAPP target" ' [citation]." (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192; *Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 278 (*Soukup*); *Chabak v. Monroy* (2007) 154 Cal.App.4th 1502, 1509.)

In evaluating a motion under the statute the trial court engages in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one 'arising from' protected activity. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then must consider whether the plaintiff has demonstrated a probability of prevailing on the claim." (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 76; *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 819-820 (*Oasis West Realty*).) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier*, *supra*, 29 Cal.4th at p. 89.)

We review an order granting or denying a motion to strike under section 425.16 de novo. (*Soukup*, *supra*, 39 Cal.4th at p. 269, fn. 3; *Oasis West Realty*, *supra*, 51 Cal.4th at p. 820.) As directed by the statute, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or the defense is based." (§ 425.16, subd. (b)(2).) We may also consider the order denying reconsideration. (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1244-1245.)

The court below addressed only the first prong of the anti-SLAPP analysis, implicitly finding the second to be moot because the action did not arise from protected activity. Because we review the motion independently, however, we are not bound by the superior court's reasoning. "If the trial court's decision is correct on any theory applicable to the case, we affirm the order regardless of the correctness of the grounds on

11

which the lower court reached its conclusion." (*Robles v. Chalilpoyil* (2010) 181 Cal.App.4th 566, 573; *City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1307; *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 357.)

Our independent review has convinced us that the denial of defendants' motion was correct for a reason separate from that of the superior court: Even if Yahoo!'s action arises from defendants' protected activity, the company has met its burden to show a probability of prevailing within the meaning of section 425.16. Thus, out of judicial efficiency we will pass the "arising from" prong to discuss the second prong of the anti-SLAPP analysis, which is dispositive of the motion. (Cf. *Oasis West Realty*, *supra*, 51 Cal.4th at p. 820 [exercising its " 'inherent, primary authority' " by proceeding "directly to the second prong"]; see also *Southern California Gas Co. v. Flannery* (2014) 232 Cal.App.4th 477, 485-486 [declining to address first prong because plaintiff had established probability of prevailing]; *Hardin v. PDX, Inc.* (2014) 227 Cal. App. 4th 159, 166 [assuming arguendo that plaintiff's claims arose from protected first amendment activity, "if credited at trial her evidence would be sufficient to support a favorable judgment"].)

2. *Probability of Prevailing*

The Supreme Court's past decisions in SLAPP cases are instructive for purposes of determining whether a plaintiff's claims have potential merit. "To satisfy the second prong, 'a plaintiff responding to an anti-SLAPP motion . . . "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited [by a trier of fact]." ' [Citation.] 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and

12

evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." ' [Citation.]" (*Oasis West Realty*, *supra*, 51 Cal. 4th at p. 820.) The Supreme Court made it clear that if the plaintiff shows a probability of prevailing " 'on *any part of its claim*,' " it has thereby established " 'that its cause of action has some merit and the entire cause of action stands.' [Citation.]" (*Ibid*.) The motion should be granted only "if, *as a matter of law*, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 (*Wilson*), italics added; *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741, fn. 10 (*Jarrow Formulas*.)

Guided by these principles, we proceed to determine "whether any portion of [Yahoo!'s] causes of action have even minimal merit within the meaning of the anti-SLAPP statute." (*Oasis West Realty*, *supra*, 51 Cal.4th at p. 825.) As noted above, in determining whether a plaintiff has made a prima facie showing for purposes of defeating an anti-SLAPP motion, "the court does not *weigh* the credibility or comparative probative strength of competing evidence." (*Soukup*, *supra*, 39 Cal.4th at p. 291.) Instead, "it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' [Citation.] The plaintiff need only establish that his or her claim has 'minimal merit' (*Navellier v. Sletten*, *supra*, 29 Cal.4th at p. 89) to avoid being stricken as a SLAPP." (*Ibid*.)

The first three causes of action in Yahoo!'s complaint alleged quiet title, breach of contract, and conversion, all based on Clarke-Martin's "fraudulent" assignment of the '596 patent to Media Relevance in violation of Yahoo!'s rights under the Confidentiality and Assignment Agreement. The fourth was a request for a declaratory judgment that Yahoo! was the "sole and rightful owner and legal title holder of the '596 [p]atent [f]amily." The last four causes of action (for breach of contract, conversion, breach of the duty of loyalty, and violation of Penal Code section 502) were all based on

13

Clarke-Martin's copying of the contents of his hard drive to compact discs without Yahoo!'s authorization.

a. *Timeliness*

Defendants' initial challenge is to the timeliness of this action. In their view, "Yahoo!'s 2014 complaint completely violates the purpose, letter, and spirit of applicable statutes of limitations, the doctrine of laches, and analogous estoppel or waiver principles."[8] Defendants assert no specific limitations period, other than to suggest that "the longest statute of limitations" for any of the causes of action is four years. They review the history of the disputes between the parties, culminating in the May 2008 settlement agreement and Clarke-Martin's Declaration of Inventor, which he submitted to the USPTO in June 2008. The settlement agreement, defendants argue, constituted an "affirmative acquiescence to Clarke-Martin's 'rights, interests, or potential claims' " in the '615 application. They also suggest that Yahoo! was on notice of the alleged harm to the company because it knew by April 2007 that Clarke-Martin had provided information to the EEOC and the SEC, as evidenced by its request to the EEOC for the return of its computer and certain documents.

Yahoo! responds, however, that none of this history triggered any statute of limitations. In its view, the assignment of the invention to Yahoo! had already taken place under the Confidentiality and Assignment Agreement, so none of the ensuing events had caused harm to Yahoo!'s ownership rights. Yahoo! correctly points out, contrary to defendants' depiction of the May 2008 settlement agreement, that Yahoo! did not affirmatively acquiesce to Clarke-Martin's rights in the '615 technology. The agreement merely excluded from its reach any "potential claims" Clarke-Martin might have regarding the '615 application, and Clarke-Martin was not restricted from using

---

**8** Defendants proceed to address only the first two grounds in their appellate briefs and do not discuss "analogous estoppel or waiver principles."

14

Yahoo!'s confidential or proprietary information in the prosecution of his "potential rights" to the '615 patent application.

Yahoo! further maintains that it had no reason to know about the assignment charged in the first four causes of action until January 2013, when the e-mail exchange between Upham from Yahoo! and Martinez from 41 Ads occurred. If these facts are believed by a trier of fact, they are sufficient to withstand the challenge based on any of the applicable statute of limitations, as Yahoo! filed its complaint less than 16 months after this discovery. That delayed discovery would likewise toll the statutes of limitations for the other claims based on the asserted wrongful assignment—i.e., the second cause of action for breach of the Confidentiality and Assignment Agreement (four years under Code of Civ. Proc. § 337) and the third cause of action for conversion (three years under Code of Civ. Proc. § 338, subd. (c)). (See *AmerUS Life Ins. Co. v. Bank of America, N.A.* (2006) 143 Cal.App.4th 631, 639 [noting discovery rule exception to statute of limitations for conversion].)[9]

Yahoo!'s better argument is its simpler one: The first four causes of action are directed at Clarke-Martin's unauthorized assignment to 41 Ads, which took place in October 2011. The complaint was filed in May 2014, well within any of the statutes of limitations defendants might have cited.

Defendants do not specifically assert Yahoo!'s noncompliance with the statutes of limitations in connection with the fifth through eighth "copying" causes of action, except

---

[9] An action for quiet title to property other than real property is not governed by a specific statute of limitations. If, as defendants assume, the nature of Yahoo!'s first cause of action is Clarke-Martin's fraud (based on the alleged "fraudulent assignment"), the three-year statute of limitations under Code of Civil Procedure section 338, subdivision (d), would apply. (See *Day v. Greene* (1963) 59 Cal.2d 404, 411 [applicable statute of limitations is determined by "the nature of the right sued upon, not by the form of the action or the relief demanded"]; *Ankoanda v. Walker-Smith* (1996) 44 Cal.App.4th 610, 615 "the theory of relief underlying an action for quiet title, in this case fraud or mistake, determines which statute of limitations applies.")

15

to assert that (1) Yahoo! knew about Clarke-Martin's provision of "whistleblowing" information to the SEC and EEOC by April 2007and negotiated with Clarke-Martin on this subject in early 2008, and (2) "[i]n mid-2008" Clarke-Martin returned his laptop computer to Yahoo! in accordance with the 2008 settlement agreement.  The second point is made without any supporting facts in the record, and we will disregard it.  (Cal. Rules of Court, rule 8.204(a)(1)(C).)  The first offers no basis for inferring anything except an employment-related grievance that led to the copying of information for disclosure to the government.

Defendants' assertion of laches is based on their general assertion of Yahoo!'s acquiescence in Clarke-Martin's interest in the patent over a period of six years, which prejudiced defendants in their effort to develop their new business.  "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." (*Conti v. Board of Civil Service Commissioners* (1969) 1 Cal.3d 351, 359; *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 68.)  The record before us, however, does not permit an inference that Yahoo!'s delay in bringing suit was unreasonable as a matter of law.  We are left with Yahoo!'s factual assertions—supported by declarations from Ishimaru and Brightman and accompanying exhibits—that (1) it had no reason to inquire into the status of its rights in the '596 patent because the assignment of the invention had already been made (though not recorded) in April 2007, and (2) until January 2013 it had no reason to believe that Clarke-Martin's copying of Yahoo!'s proprietary information had been used not just for his "whistleblowing" acts but also for his competing business, thus creating the damage alleged in the complaint.  Accordingly, without resolving questions of credibility or weighing evidence, we must conclude that Yahoo! provided evidence sufficient to withstand defendants' assertions that their action was untimely under either the applicable statutes of limitations or the doctrine of laches.

16

b. *Potential Merit of Yahoo!'s Claims*

As discussed earlier, the central question in step two of the anti-SLAPP analysis is whether the complaint is " 'both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citation.]" (*Soukup*, *supra*, 39 Cal.4th at p. 291; *Wilson*, *supra*, 28 Cal.4th at p. 821; *Jarrow Formulas*, *supra*, 31 Cal.4th at p. 741.) "In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . ' [Citation.]" *Soukup*, *supra*, at p. 291 As noted, "the anti-SLAPP statute requires only 'a minimum level of legal sufficiency and triability' " to survive an anti-SLAPP motion.) (*Jarrow Formulas*, *supra*, at p. 738; *Navellier*, *supra*, 29 Cal.4th at p. 89, quoting *Linder v. Thrifty Oil Co*. (2000) 23 Cal. 4th 429, 438, fn. 5.)

The claims comprised in Yahoo!'s complaint pertain to the allegedly improper assignment to 41 Ads in October 2011 (first through fourth causes of action) and the unauthorized copying of Yahoo!'s confidential and proprietary information, including documents detailing Yahoo!'s business strategy (fifth through eighth causes of action). In an argument suggestive of a demurrer, defendants first attack the facial adequacy of the complaint, as it "doesn't bother mentioning the identity of the relevant statutes or their elements, much less how the substantive allegations line up with the elements. . . . Key paragraphs throughout are entirely conclusory. . . . The complaint purports to be based on breach of contract, but fails to restate the relevant portions of the contract in *haec verba*. It repeatedly misrepresents the 2003 [Confidentiality and Assignment] Agreement [and] fails substantively to allege the element of damages for any of the allegations." In addition to the contract claims, defendants attack the first cause of action for quiet title, because it accuses Clarke-Martin of the "fraudulent assignment of the '596 patent" without the "fullest possible details of the charge [of fraud.]"

Defendants' argument, which cites no legal authority, fails to convince us that Yahoo!'s allegations are legally insufficient. The complaint sets forth the provision of

17

the Confidentiality and Assignment Agreement requiring Clarke-Martin to assign to Yahoo! "all Inventions which I may solely or jointly develop or reduce to practice" during or within three months of his employment at Yahoo!. As defendants have emphasized, the complaint did not quote the exception to this requirement for inventions Clarke-Martin might create on his own time without using Yahoo! resources; but that omission alone does not vitiate the sufficiency of the complaint. The complaint alleges that Yahoo! suffered harm from defendants' conduct; it was not obligated to set forth the amount of damages in the complaint itself. The essence of the first cause of action was not fraud but quiet title, based on Clarke-Martin's allegedly wrongful assignment in violation of Yahoo!'s valid title to the '596 patent. The complaint alleged that Clarke-Martin had "falsely claimed" title to the patent and wrongfully assigned the patent to his business. The allegation thus sufficiently identified the nature of the right and the misconduct to form an actionable claim for quiet title.

Defendants challenge the legal sufficiency of the "copying" causes of action by asserting that they are all based on misappropriation of trade secrets and are therefore preempted by the California Uniform Trade Secrets Act, Civil Code section 3426 et seq. (CUTSA).[10] We do not dismiss this point as readily as does Yahoo!; we do note, however, that defendants do not contend that Yahoo! cannot state a cause of action under the CUTSA, but only that it does not. We cannot presume that future proceedings will deprive Yahoo! of an opportunity to amend its pleading should a demurrer or similar proceeding result in striking any of these causes of action. Any purported resolution of this issue would therefore be premature.

---

[10] The CUTSA "provides the exclusive civil remedy for conduct falling within its terms, so as to supersede other civil remedies 'based upon misappropriation of a trade secret.' " (*Silvaco Data Systems v. Intel Corp.* (2010) 184 Cal.App.4th 210, 236.) It supersedes "common law claims that are 'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.' " (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 958.)

Defendants' final contention is that "the most basic premise of the Patent Claims—that Yahoo! *ever* had *any* right to Clarke-Martin's co-ownership of his own software invention in the first place—is false." In defendants' view, the evidence presented was "highly probative that neither party regarded the ad-matching invention as falling within the 2003 Employment Agreement . . . Yahoo!'s own conduct demonstrates that it did not consider Clarke-Martin's invention to be 'related to' its business."

We do not view the evidence so unequivocally. Defendants' position depends on more than one factual premise that was either in dispute or speculative: that Yahoo! "deemed" the invention to be worthless as early as 2005; that the invention was unrelated to Yahoo!'s business; that it "was perfectly willing to affirmatively acquiesce to Clarke-Martin's co-ownership of the Patent" when it executed the settlement agreement; and that Yahoo! has not used the invention, "whereas Clarke-Martin has built a company to implement it." This focus on Yahoo!'s approach to Clarke-Martin's invention and its reaction to his conduct requires an adjudication of facts and a drawing of inferences that we cannot undertake within the limited scope of our review. As noted earlier, in considering step two of the anti-SLAPP analysis "the court does not weigh the evidence or make credibility determinations." (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906; accord, *Navellier*, *supra*, 106 Cal.App.4th at p. 768.) "Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . and evaluate the defendant's evidence only to determine [whether] it has defeated [the plaintiff's evidence] as a matter of law. [Citations.]" (*HMS Capital*, *Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) We cannot overlook this stringent standard of review in order to accommodate a version of the facts that does not defeat Yahoo!'s evidence as a matter of law.

We thus conclude that the declarations submitted by Yahoo!, together with the Employment and Assignment Agreement, were sufficient to create viable factual issues that cannot be resolved as a matter of law in this proceeding. Whether Yahoo! can

19

ultimately succeed in its effort to establish defendants' liability remains to be seen, and we express no opinion about the merits of the issues raised in its complaint beyond the conclusion that Yahoo! met the "minimal merit" standard required to withstand an anti-SLAPP motion. Because its opposition demonstrated " 'a minimum level of legal sufficiency and triability,' " (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 738), reversal of the court's order is not required.

*Disposition*

The order is affirmed.

_____

ELIA, ACTING P.J.

WE CONCUR:




_____

BAMATTRE-MANOUKIAN, J.




_____

MIHARA, J.